Kristine M. Akland
AKLAND LAW FIRM PLLC
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com

*Attorney for Plaintiff* (additional counsel listed on signature page)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | Case No. 9:19-cv-00109-DLC |
| Plaintiff, | **BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| DAVID BERNHARDT, Secretary of the Interior; and AURELIA SKIPWITH, Director of the U.S. Fish and Wildlife Service; | |
| Defendants, | |
| STATE OF WYOMING, STATE OF IDAHO, WYOMING STOCK GROWERS' ASSOCIATION, WYOMING FARM BUREAU FEDERATION, UTAH FARM BUREAU FEDERATION, | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

LEGAL BACKGROUND .....................................................................................2

FACTUAL AND PROCEDURAL BACKGROUND ...........................................4

  I.   The Grizzly Bear And Its Outdated Recovery Plan .......................................4

  II.  The Center's Petition To Update The Grizzly Bear Recovery Plan .............7

  III. The Current Lawsuit ....................................................................................9

STANDARD OF REVIEW ...................................................................................9

ARGUMENT .......................................................................................................10

  I.   Because A Recovery Plan Qualifies As A "Rule" Under The APA,
      The Service's Principal Basis For Denying The Petition Is Wrong..............10

  II.  The Service's Petition Denial Arbitrarily Refused To Evaluate The
      Potential For Bear Recovery In Unoccupied Suitable Habitat, Despite
      The Agency's Previous Commitments ..........................................................19

  III. The Service's Additional "Reasons" For Denying The Petition Are
      Arbitrary And Capricious ..............................................................................25

     A.   Even Under The Service's Priorities Stated In Its Denial Letter,
          Recovery Is Necessary In The San Juan Mountains ...............................25

     B.   Pursuit of Recovery In Additional Areas Would Not "Erode"
          Recovery Success ....................................................................................27

  IV. By Failing To Evaluate Or Pursue Bear Recovery In Additional Areas,
      The Service Is Violating Its Conservation Duties Under The ESA ..............31

  V.   The Service's Refusal To Update The 1993 Recovery Plan With
      Current Scientific Information Is Contrary To The APA And ESA .............35

CONCLUSION ....................................................................................................42

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Alaska v. Lubchenco,*
  723 F.3d 1043 (9th Cir. 2013)................................................................14

*Animal Legal Def. Fund v. Veneman,*
  469 F.3d 826 (9th Cir. 2006), *vacated on other grounds,*
  490 F.3d 725 (9th Cir. 2007)................................................... 11, 16, 17

*Ariz. Cattle Growers' Ass'n v. Salazar,*
  606 F.3d 1160 (9th Cir. 2009)..............................................................27

*Bennett v. Spear,*
  520 U.S. 154 (1997) ..............................................................................12

*Bonnichsen v. United States,*
  217 F. Supp. 2d 1116 (D. Or. 2002)......................................................23

*Carson-Truckee Water Conservancy Dist. v. Clark,*
  741 F.2d 257 (9th Cir. 1984), *cert. denied,* 105 S. Ct. 1842 (1985)....................32

*Cascadia Wildlands v. Thrailkill,*
  49 F. Supp. 3d 774 (D. Or. 2014).........................................................14

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ...................................................................... 10, 25

*Crow Indian Tribe v. United States,*
  343 F. Supp. 3d 999 (D. Mont. 2018) .................................... 29, 30, 34

*Ctr. for Biological Diversity v. Salazar,*
  804 F. Supp. 2d 987 (D. Ariz. 2011).....................................................15

*Ctr. for Biological Diversity v. Vilsack,*
  No. 2:13-cv-1785-RFB-GWF, 2018 U.S. Dist. LEXIS 110261
  (D. Nev. June 19, 2018).........................................................................35

*Ctr. for Biological Diversity v. Zinke,*
  399 F. Supp. 3d 940 (D. Ariz. 2019)....................................... 37, 41

*Ctr. for Biological Diversity v. Zinke,*
  868 F.3d 1054 (9th Cir. 2017)...............................................................10

*Davis v. Mineta,*
  302 F.3d 1104 (10th Cir. 2002).............................................................23

*Defs. of Wildlife v. Babbitt*,
   130 F. Supp. 2d 121 (D.D.C. 2001) .......................................................... 33, 41, 42

*Defs. of Wildlife v. Norton*,
   258 F.3d 1136 (9th Cir. 2001) ............................................................................30

*Defs. of Wildlife v. Tuggle*,
   607 F. Supp. 2d 1095 (D. Ariz. 2009) ................................................................17

*Fla. Key Deer v. Brown*,
   364 F. Supp. 2d 1345 (S.D. Fla. 2005) ......................................................... 33, 34

*Fla. Key Deer v. Paulison*,
   522 F.3d 1133 (11th Cir. 2008) ..........................................................................32

*Friends of the Wild Swan, Inc. v. Thorson*,
   260 F. Supp. 3d 1338 (D. Or. 2017), *aff'd*,
   745 F. App'x 718 (9th Cir. 2018) ............................................................ 13, 14, 41

*Fund for Animals v. Babbitt*,
   903 F. Supp. 96 (D.D.C. 1995). ................................................................ 5, 33, 40

*Grand Canyon Tr. v. Norton*,
   No. 04-CV-636-PHX-FJM, 2006 U.S. Dist. LEXIS 2375
   (D. Ariz. Jan. 18, 2006) ......................................................................................41

*Humane Soc'y of the United States v. Zinke*,
   865 F.3d 585 (D.C. Cir. 2017) ................................................................. 29, 30, 31

*Idaho Cty. v. Evans*,
   No. CV02-80-C-EJL, 2003 U.S. Dist. LEXIS 23459
   (D. Idaho Sep. 30, 2003) ....................................................................................17

*Indep. Equip. Dealers Ass'n v. EPA*,
   372 F.3d 420 (D.C. Cir. 2004) ............................................................................12

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990) ...........................................................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .......................................................................... 10, 24, 27, 37

*Nat'l Wildlife Fed'n v. Babbitt*,
   128 F. Supp. 2d 1274 (E.D. Cal. 2000) ...............................................................15

*Nehemiah Corp. of Am. v. Jackson*,
   546 F. Supp. 2d 830 (E.D. Cal. 2008) ........................................................... 22-23

iv

*O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*,
  92 F.3d 940 (9th Cir. 1996) ...................................................................12

*Or. Nat. Desert Ass'n v. Rose*,
  921 F.3d 1185 (9th Cir. 2019) ...............................................................37

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
  465 F.3d 977 (9th Cir. 2006) .................................................................12

*Or. Nat. Res. Council v. Thomas*,
  92 F.3d 792 (9th Cir. 1996) ............................................................ 24, 38

*Palila v. Haw. Dep't of Land & Nat. Res.*,
  639 F.2d 495 (9th Cir. 1981) .................................................................15

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ................................................................................11

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,
  898 F.2d 1410 (9th Cir. 1990) ...............................................................32

*Rocky Mt. Wild v. Walsh*,
  216 F. Supp. 3d 1234 (D. Colo. 2016) ............................................ 16, 17

*Rosenbloom v. Pyott*,
  765 F.3d 1137 (9th Cir. 2014) ...............................................................11

*Safari Club Int'l v. Zinke*,
  878 F.3d 316 (D.C. Cir. 2017) ...............................................................17

*Seldovia Native Ass'n v. Lujan*,
  904 F.2d 1335 (9th Cir. 1990) ...............................................................23

*Sierra Club v. Glickman*,
  156 F.3d 606 (5th Cir. 1998) .......................................................... 32, 34

*Sw. Ctr. for Biological Diversity v. Bartel*,
  457 F. Supp. 2d 1070 (S.D. Cal. 2006) ........................................... 15, 16

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) .......................................................................... 2, 34

*Tucson Herpetological Soc'y v. Salazar*,
  566 F.3d 870 (9th Cir. 2009) .................................................................29

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  139 S. Ct. 361 (2018) ............................................................................20

*Wild Fish Conservancy v. U.S. EPA*,
  No. C08-0156-JCC, 2010 U.S. Dist. LEXIS 41838

(W.D. Wash. Apr. 28, 2010) ................................................................................15

## Statutes

16 U.S.C. § 1531(b) ................................................................................. 2, 13

16 U.S.C. § 1531(c) ............................................................................. 3, 13, 32

16 U.S.C. §§ 1531-1544 .............................................................................2

16 U.S.C. § 1532(3) ............................................................................ 3, 13, 33

16 U.S.C. § 1533(b)(1)(A) ..........................................................................40

16 U.S.C. § 1533(b)(2) ................................................................................40

16 U.S.C. § 1533(c)(2)(A) .............................................................................7

16 U.S.C. § 1533(f) .......................................................................... 13, 35, 42

16 U.S.C. § 1533(f)(1) ............................................................................. 3, 32

16 U.S.C. § 1533(f)(1)(B) ........................................................................ 13, 38

16 U.S.C. § 1533(f)(1)(B)(i) ...................................................................... 3, 40

16 U.S.C. § 1533(f)(1)(B)(ii) ........................................................... 3, 18, 39, 40

16 U.S.C. § 1533(f)(3) ................................................................................16

16 U.S.C. § 1533(f)(4) ................................................................................16

16 U.S.C. § 1536 ................................................................................. 13, 14

16 U.S.C. § 1536(a)(1) ......................................................................... 3, 32, 35

16 U.S.C. § 1539(a) ....................................................................................15

16 U.S.C. § 1540(g) .....................................................................................9

5 U.S.C. § 551(4) ......................................................................................11

5 U.S.C. §§ 551-559.....................................................................................2

5 U.S.C. § 553(e) .................................................................................. 7, 10

5 U.S.C. § 706 ...........................................................................................9

5 U.S.C. § 706(2)(A).......................................................................... 19, 35, 42

## Regulations

50 C.F.R. § 402.02 ....................................................................................33

**<u>Other Authorities</u>**

40 Fed. Reg. 31,734 (July 28, 1975).............................................................4

82 Fed. Reg. 30,502 (June 30, 2017) ...................................... 18, 19, 28

83 Fed. Reg. 18,737 (April 30, 2018) .....................................................29

## INTRODUCTION

Plaintiff Center for Biological Diversity (hereinafter "the Center") respectfully submits this brief in support of its motion for summary judgment. As the brief explains, Federal Defendants – David Bernhardt, Secretary of the Interior, and Aurelia Skipwith, Director of the U.S. Fish and Wildlife Service (collectively the "Service") – arbitrarily denied the Center's Petition requesting that the agency amend the outdated 1993 Grizzly Bear Recovery Plan ("the Plan").

The Center's Petition asks the Service to revisit the Plan to address two fundamental problems, which the Service itself identified and pledged to address. First, the Plan fails to evaluate the potential for grizzly bear recovery in additional suitable habitat within its historical range, and second, the Plan no longer reflects the best available and most current science. The Service's primary rationale for denying the Petition – that the APA does not authorize petitioning for recovery plans because recovery plans do not fall within the APA's definition of a "rule" – does not comport with case law holding that legally-mandated agency planning documents qualify as rules under the APA's broad definition.

Because of the Service's mistaken view that a recovery plan cannot qualify as a rule under the APA, the Service set forth virtually no substantive reasons for its denial of the Petition. The scant reasons it did set forth are arbitrary and capricious and unsupported by anything in the rulemaking record.

The Service unreasonably refused to evaluate or pursue grizzly bear recovery in additional areas of the grizzly bear's historic range despite its longstanding commitment to do so. The Plan fails to include *any* measures to promote grizzly bear recovery outside of six areas identified in 1993, even though grizzly bear "conservation," as mandated by section 4(f) and section 7(a)(1) of the ESA, requires consideration of additional historical habitat areas. The Service did not respond at all to the Center's request that the Service update the Plan with current science, even though the Service's own scientists identified the need for such updates.

 For these reasons, as further explained below, the Service is in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.

## LEGAL BACKGROUND

The Endangered Species Act is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). It is intended to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and to "provide a program for the conservation of such … species." 16 U.S.C. § 1531(b).

To carry out the ESA's paramount purpose that listed species be

2

"conserved," section 4(f) sets forth a detailed recovery planning process. Section 4(f)(1) provides that the Service "shall develop and implement [recovery] plans for the conservation and survival of endangered species and threatened species . . . ." *Id*. § 1533(f)(1). The ESA defines "conservation" as the "use of *all* methods and procedures which are necessary to bring [listed] species to the point at which the measures provided pursuant to this chapter are no longer necessary," *id.* § 1532(3) (emphasis added), i.e. to bring about the full recovery of listed species.

In addition, the Service, "in developing and implementing recovery plans, shall, to the maximum extent practicable" incorporate "such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species," as well as "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list." *Id.* § 1533(f)(1)(B)(i), (ii).

In furtherance of the ESA's conservation goals, section 7(a)(1) of the ESA imposes an affirmative duty for federal agencies to conserve listed species. *Id.* § 1536(a)(1). It provides that all federal agencies shall "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species . . . ." *Id.*; *see also id.* § 1531(c). This substantive mandate ensures that listed species benefit from

agencies taking actions needed for species survival and recovery, such as those prescribed in recovery plans.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    The Grizzly Bear And Its Outdated Recovery Plan

The grizzly bear once ranged throughout most of western North America, from the high Arctic to Mexico, and from the coast of California across most of the Great Plains. AR0329 (Recovery Plan at 9). Over 50,000 grizzlies likely once lived in the western United States. *Id.*

European settlement of the American West led to bounty programs aimed at the eradication of grizzly bears and other large carnivores, and they were shot, trapped, and poisoned for decades. AR05291 (5-Year Review at 28). People eliminated grizzlies from Texas by 1890 and from California by 1922. AR0329. The bears were last reported in Utah in 1923, Oregon in 1931, New Mexico in 1933, and Arizona in 1935. *Id.* By the 1930s, people had reduced the bear's range and numbers to less than two percent of historical levels. AR05291.

In 1975, the Service listed the grizzly bear as "threatened" in the lower 48 states under the ESA. 40 Fed. Reg. 31,734 (July 28, 1975). Likely fewer than 1,000 grizzly bears then remained. AR0329. At the time of listing, grizzlies were known to still live in portions of Colorado, Idaho, Montana, Washington, and Wyoming. AR0353. A poacher shot Colorado's last known grizzly bear in 1979. AR0331.

The Service approved a grizzly bear recovery plan in 1982 and revised this plan in 1993. The Service identified four recovery zones – Yellowstone, Northern Continental Divide, Cabinet-Yaak, and Selkirks – and three evaluation areas – Bitterroot, North Cascades, and San Juan Mountains – for potential recovery. AR0315.

The Service prepared geographically specific supplements to the 1993 Recovery Plan in 1996 (Bitterroot, AR0281); 1997 (North Cascades, AR0217); 2007 and 2017 (Greater Yellowstone, AR0130, AR0165, and AR0100); and 2018 (North Continental Divide, AR0047).[1] With these supplements in place, the Service has now designated six recovery zones: Yellowstone, Northern Continental Divide, Cabinet-Yaak, Selkirks, Bitterroot, and North Cascades. AR0716 (map in 2018 Annual Report).

In the 1993 Recovery Plan, the Service committed to evaluate "the San Juan Mountains of Colorado and other potential recovery areas throughout the historical range of the grizzly bear . . . ." AR0433. The Service anticipated that the analysis would take five years to complete. *Id.*

Thereafter, in August 2011, the Service published a five-year status review

---

[1] The Service supplemented the 1993 Recovery Plan in part because of a court decision holding that the Plan failed to establish "objective, measurable criteria" to "measure whether threats to the grizzly bear have been ameliorated." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 111 (D.D.C. 1995).

for grizzly bears ("5-Year Review"). The Service again specifically noted that "other areas throughout the historic range of the grizzly bear in the lower 48 States should be evaluated to determine their habitat suitability for grizzly bear recovery," including "Colorado, New Mexico, Arizona, Utah, California, Nevada, Oregon, and southern Washington (mountain ranges in the western U.S.)." AR05370. Yet the Service has not updated the Plan to evaluate or pursue recovery in these additional areas in the grizzly bear's historical range.

In the 5-Year Review, the Service also explained that except for the geographically-focused supplements, "the recovery plan and the associated recovery criteria have not been updated since the plan was released in 1993" and "no longer reflects the best available and most up-to-date information on the biology of the species and its habitat." AR05277-78. In the section entitled "Recommendations for Future Actions," the Service listed, as its first recommendation, the need to "[r]evise the recovery plan . . . so that it reflects the best scientific and commercial information available." AR05368.

The Service subsequently published revised demographic recovery criteria for the Yellowstone Ecosystem in 2017 and habitat-based recovery criteria for the Northern Continental Divide Ecosystem in 2018. But the Service never updated the recovery criteria nor any other outdated information for the other four recovery areas. Additionally, although the Act requires that the Service prepare status

6

reviews every five years, 16 U.S.C. § 1533(c)(2)(A), more than eight years have passed since the Service completed its last review.

Fewer than 1,900 grizzlies likely survive in the lower 48 states. AR0717-27 (2018 Annual Report). Most live in the northern Rocky Mountains, in four of six recovery zones. AR0717 (Greater Yellowstone: approximately 709 bears); AR0719 (North Continental Divide: approximately 1,029 bears); AR0721 (Cabinet-Yaak: 55-60 bears); AR0724 (Selkirk, including Canada portions: 75-80 bears). The North Cascades have had only sporadic sightings of lone bears (AR0726) and the Bitterroot zone has no known population (AR0727). Grizzlies cannot be found anywhere else in their vast historical range in the lower 48 states.

## II.  The Center's Petition To Update The Grizzly Bear Recovery Plan

On June 18, 2014, the Center submitted to the Service a formal petition, pursuant to the APA, 5 U.S.C. § 553(e), for the development of an updated recovery plan for the grizzly bear. Specifically, the Petition requests that the Service revise the Plan to address "significant remaining areas of suitable habitat across the grizzly bear's native range in the western U.S." AR0011. The Petition summarizes numerous scientific publications describing suitable habitat for grizzly bears in the Gila/Mogollon complex in Arizona and New Mexico, the Grand Canyon in Arizona, the Sierra Nevada in California, the Uinta Mountains in Utah, and elsewhere. AR0022. The Petition also requests revised recovery criteria and

updates with current scientific information relevant to bear recovery, such as findings of new research on road density limits and new techniques to reconnect grizzly bear recovery areas. AR0033.

On September 22, 2014, the Service denied the Petition. In its short denial letter, the Service asserted that "[r]ecovery plans are not rules under the APA," and thus "Section 553(e) does not provide the right to petition for the issuance of a recovery plan." AR0008 (Denial Letter at 1). It stated that the agency "prioritized" recovery in "the locations where grizzly bear populations were present or thought to be present in 1975 (when they were listed) and where habitat and environmental conditions existed for grizzly recovery." AR0009. The Service asserted that "any additional recovery planning is subject to Service prioritization and is discretionary," and that it had "satisfied [its] statutory responsibilities for recovery planning and implementation." AR0009.

The Service did not acknowledge its previous commitments, made in the 1993 Recovery Plan and 5-Year Review, to analyze other areas of suitable habitat for grizzly bear recovery. Nor did the agency acknowledge its finding in the 5-Year Review that the existing Plan is outdated and fails to reflect the best available science.

### III.    The Current Lawsuit

The Center filed this case on June 27, 2019. ECF-1. The First Claim in the Center's Complaint challenges the Service's failure to complete a timely five-year status review for the grizzly bear in violation of section 4(c) of the ESA. Compl. ¶¶ 38-41. On December 9, 2019, the Court ordered the Service to complete the overdue review by March 31, 2021, pursuant to the parties' settlement. ECF-38.

The Service lodged the supplemental administrative record on April 10, 2020, after the Court granted in part the Center's motion challenging the administrative record. ECF-45. The Center now moves for summary judgment on the claims remaining in its Complaint.

The Center challenges the Service's denial of the Center's Petition as arbitrary and capricious. Compl. ¶¶ 59-68 (Fourth Claim). It also challenges the Service's failure to "develop and implement" a recovery plan that provides for the "conservation" of the species, in violation of sections 4(f) and 7(a)(1) of the ESA. *Id.* ¶¶ 42-50, 51-58 (Second and Third Claims).

## STANDARD OF REVIEW

The Center brings this case under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the APA, 5 U.S.C. § 706, which also provides the standard of review. Under this standard, the Service's action or inaction should be set aside when "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law." *Ctr. for Biological Diversity v. Zinke*, 868 F.3d 1054, 1057 (9th Cir.

2017).

The court must engage in a "thorough, probing, in-depth review," *Citizens to*

*Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), to determine whether

the agency has "articulate[d] a satisfactory explanation for its action . . . ." *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In

particular, agency action must be reversed when the agency "entirely fail[ed] to

consider an important aspect of the problem [or] offer[ed] an explanation for its

decision that runs counter to the evidence before the agency . . . ." *Id.*

## ARGUMENT

As explained below, the Center is entitled to summary judgment because the

Service's denial of the Center's Petition, and the agency's refusal to consider

grizzly bear recovery in additional areas and update the 1993 Grizzly Bear

Recovery Plan with current science, violate the ESA and the APA.

## I.   Because A Recovery Plan Qualifies As A "Rule" Under The APA, The Service's Principal Basis For Denying The Petition Is Wrong

In denying the Center's Petition, the Service relies on its untenable position

that the APA does not authorize a recovery plan petition because a recovery plan is

not a "rule." The APA provides a right to petition for a "rule," 5 U.S.C. § 553(e),

and recovery plans squarely fit within the APA's broad definition of a "rule," *id.*

§ 551(4).

Under the APA, a "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." 5 U.S.C. § 551(4); *see Allen v. United States*, No. 17-17463, 2019 U.S. App. LEXIS 38810, at *9 (9th Cir. Dec. 31, 2019) (explaining that "a standard of general applicability and future effect" qualifies as a rule).

The U.S. Supreme Court, as well as numerous lower courts, have emphasized the breadth of the APA's definition. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-96 (2015) ("'Rule,' in turn, is defined broadly . . . ."); *see, e.g.*, *Animal Legal Def. Fund v. Veneman*, 469 F.3d 826, 838-40 (9th Cir. 2006), *vacated on other grounds*, 490 F.3d 725 (9th Cir. 2007) (en banc)[2] ("The term 'rule' may embrace 'virtually every statement an agency may make' but not all agency statements are reviewable . . . .").

In its denial letter, the Service asserts that recovery plans cannot be rules because they are "discretionary guidance documents that are non-binding and non-enforceable." AR0008. While the binding nature and enforceability of agency planning documents may have relevance to their reviewability under the APA as

---

[2] In *Animal Legal Def. Fund*, the parties reached settlement and requested vacatur of the panel's opinion. 490 F.3d at 726. "[D]ecisions vacated for reasons unrelated to the merits may be considered for the persuasive[ness] of their reasoning." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1154 n.14 (9th Cir. 2014).

"final agency actions," that is not dispositive of whether they fall within the APA's broad definition of a "rule." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997)) (explaining that agency action must have "legal consequences" to qualify as "final agency action" subject to judicial review under the APA). In any case, the Service's denial of the Petition is the final agency action challenged by the Center's APA claims, not the 1993 Recovery Plan or any other agency action or inaction pertinent to that Plan. *See O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (reviewing agency's denial of petition brought under section 553(e) of the APA as "final agency action" pursuant to section 706(2)(A)).

Recovery plans prepared pursuant to the ESA satisfy the criteria for a "rule" as defined by the APA. 5 U.S.C. § 551(4). A recovery plan is "an agency statement of general or particular applicability," *id.*, because the Service publishes the plan pursuant to the ESA's mandate. *See Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428 (D.C. Cir. 2004) ("[T]he EPA Letter is certainly a statement of general or particular applicability – what isn't? . . .").

Next, recovery plans are "designed to implement . . . or prescribe law or policy." 5 U.S.C. § 551(4). Recovery plans implement law because the ESA expressly mandates the Service to incorporate particular standards into recovery

plans, such as (1) "site-specific management actions" necessary for the

conservation and survival of the species, and (2) "objective, measurable criteria"

by which to monitor the species' recovery. 16 U.S.C. § 1533(f)(1)(B).

In addition, by identifying actions necessary to conserve endangered species,

recovery plans implement a "policy of Congress" that "all Federal departments and

agencies shall seek to conserve endangered species and threatened species and

shall utilize their authorities in furtherance of [the ESA's purposes]." 16 U.S.C.

§ 1531(c); *see also id*. § 1531(b) (providing the ESA's "purposes," which include

"provid[ing] a program for the conservation" of listed species).

Recovery plans have "future effect" because, pursuant to the ESA's

statement that the Service "shall" implement recovery plans, 16 U.S.C. § 1533(f),

and the ESA's overriding policy that agencies work to bring about the

"conservation" – i.e., recovery – of listed species, *id.* §§ 1531(c), 1532(3), 1536,

the Service and other agencies in fact do routinely consider recovery plans when

carrying out duties under the ESA or other environmental laws. Accordingly, it is

indisputable that recovery plans have "real-world consequences" and "may affect

an agency's future conduct." *Friends of the Wild Swan, Inc. v. Thorson*, 260 F.

Supp. 3d 1338, 1344 n.7 (D. Or. 2017).[3]

---

[3] In *Friends of the Wild Swan*, the court held that "even though the Secretary has a non-discretionary duty to incorporate the items from § 1533(f)(1)(B) into recovery plans 'to the maximum extent possible,' how the Secretary does so is

"Consultation" under section 7 of the ESA provides an example of how recovery plans have "future effect." The ESA requires agencies to consult over actions that may affect listed species and requires the Service or the National Marine Fisheries Service – federal agencies tasked with managing listed species – to prescribe "reasonable and prudent measures" to minimize impacts. 16 U.S.C. § 1536. Several cases examine how agencies use recovery plans during section 7 consultation to develop mitigation measures. In *Alaska v. Lubchenco*, the Ninth Circuit addressed how the National Marine Fisheries Service through consultation considered the prospects of the Stellar sea lion's recovery, as set out in its recovery plan, when limiting commercial fishing to address the sea lion's nutritional stress. 723 F.3d 1043, 1053-54 (9th Cir. 2013); *see also, e.g.*, *Cascadia Wildlands v. Thrailkill*, 49 F. Supp. 3d 774, 787 (D. Or. 2014) (explaining that the Service and the Bureau of Land Management through consultation directed implementation of the spotted owl's recovery plan by limiting timber salvage activities in the owl's core use areas). Indeed, courts have held that "action agencies" and the Service were arbitrary and capricious for failing to adequately take recovery plans into consideration before taking or authorizing actions that might impair species'

---

discretionary." 260 F. Supp. 3d at 1341. In ruling for defendants, the court explained that "the deficiencies [alleged by plaintiffs] related to areas within the Defendants' discretion rather than a non-discretionary duty." *Id.*, aff'd, 745 F. App'x 718, 719 (9th Cir. 2018).

survival or recovery. *See, e.g., Wild Fish Conservancy v. U.S. EPA*, No. C08-0156-JCC, 2010 U.S. Dist. LEXIS 41838, at *16 (W.D. Wash. Apr. 28, 2010) (holding that the agencies were unreasonable for failing to use the recovery plans for salmon and orca during consultation over Washington State water-quality regulations); *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 999 (D. Ariz. 2011) ("Here, the BiOp's jeopardy and adverse modification analyses for both the umbel and flycatcher violate the ESA because they fail adequately to address whether the proposed action appreciably reduces the likelihood of recovery.").

Recovery plans also guide the Service's decisions on whether to issue "incidental take permits" that authorize accidental harm to endangered species if mitigated through "habitat conservation plans." 16 U.S.C. § 1539(a); *see, e.g., Sw. Ctr. for Biological Diversity v. Bartel*, 457 F. Supp. 2d 1070, 1087 (S.D. Cal. 2006). In *Sw. Center for Biological Diversity*, the court discussed the importance of timely developing a recovery plan, explaining that the Service "would use the recovery plan to evaluate the sufficiency of the application for an ITP [Incidental Take Permit]." *Id.*; *see also Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1283 (E.D. Cal. 2000) (explaining that a habitat conservation plan provided for incorporating the recovery plan). *Cf. Palila v. Haw. Dep't of Land & Nat. Res.*, 639 F.2d 495, 496 (9th Cir. 1981) (explaining that an endangered bird's recovery plan "led to establishment of the bird's critical habitat [where] the plan concluded that

the eradication of the sheep and goats was necessary to achieve the regeneration of the forest and restoration of the Palila.").

In short, recovery plans have "future effect" because they are often followed by the Service and other federal agencies pursuant to their obligations to conserve species under the ESA. Indeed, the ESA envisions efforts toward implementation of measures identified in recovery plans, given that the Service must report to Congressional committees every two years "on the status of efforts to develop and implement recovery plans." 16 U.S.C. § 1533(f)(3); *Sw. Ctr. for Biological Diversity*, 457 F. Supp. 2d at 1086 n.16 ("There would be no need for such ongoing reports if [the Service was] not endeavoring to meet the goal of recovery, as described in the recovery plan.").

Furthermore, prior to final approval for any "new or revised recovery plan," the Service must "provide public notice and an opportunity for public review and comment." 16 U.S.C. § 1533(f)(4). That recovery plans are the culmination of these formal processes is further evidence that recovery plans qualify as rules. *Animal Legal Def. Fund*, 469 F.3d at 840 ("Our conclusion [that the enrichment policy is an interpretative rule] is buttressed by the Draft Policy's publication in the Federal Register, and the fact that the USDA opened a public comment period for it."); *Rocky Mt. Wild v. Walsh*, 216 F. Supp. 3d 1234 (D. Colo. 2016) (holding that the Service's "Policy on the Evaluation of Conservation Efforts" is a rule after

16

noting that it was "not published in the Code of Federal Regulations, but it was nonetheless adopted through a formal notice-and-comment process.").

While no court has addressed whether recovery plans, in particular, qualify as rules under the APA, district courts within the Ninth Circuit have held that similar planning documents qualify. *See, e.g.*, *Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d 1095, 1114-15 (D. Ariz. 2009). In *Defs. of Wildlife*, environmental groups challenged the Service's adoption of two documents that govern the management of reintroduced Mexican wolves, like a recovery plan does. The court held that these planning documents fall within the APA's definition of "rule," as does "virtually every statement an agency may make." *Defs. of Wildlife v. Tuggle*, 607 F. Supp. 2d at 1114.[4]

---

[4] Numerous other cases have held that agency planning and policy documents qualify as rules under the APA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892 (1990) (actions pursuant to the Bureau of Land Management's "land withdrawal review program" that reflected "the agency's intent to grant requisite permission for certain [mining] activities"); *Safari Club Int'l v. Zinke*, 878 F.3d 316, 320-21, 332-33 (D.C. Cir. 2017) (the Service's findings that the trophy killing of elephants in Zimbabwe would not "enhance the survival of the species."); *Animal Legal Def. Fund*, 469 F.3d at 838-40 (a policy from the U.S. Department of Agriculture on how to provide for mental well-being of captive primates); *Rocky Mt. Wild*, 216 F. Supp. 3d at 1245 (a policy drafted by the Service to guide its decisions about the effectiveness of voluntary conservation efforts that could preclude the need for listing under the ESA); *Idaho Cty. v. Evans*, No. CV02-80-C-EJL, 2003 U.S. Dist. LEXIS 23459, at *20-21 (D. Idaho Sep. 30, 2003) (an amendment to the "Pacific Salmon Fishery Management Plan" that identifies habitat for Pacific salmon).

The grizzly bear's Plan – which the Center sought to update through its Petition – is a rule under the APA. It has implemented the ESA by including elements that the ESA requires, such as "objective, measurable criteria." 16 U.S.C. § 1533(f)(1)(B)(ii); *see, e.g.*, AR0166 (2007 Supplement at 2) (discussing its "3 objective and measurable habitat criteria"). It has prescribed prospective policy by describing actions for federal and state agencies to implement that would promote grizzly bear recovery. *See* 82 Fed. Reg. 30,502, 30,508 (June 30, 2017) ("[The recovery plan and supplements] lay out where we need to go and how to get there through specific actions."); AR0716 (2018 Annual Report) ("Principle recovery efforts focus on conflict reduction, information and education, establishment of habitat protections, and other efforts to prevent and reduce human-caused mortality.").

For example, the Plan prescribes restrictions on motorized access in key habitats. AR0166 ("The percent of secure habitat within each bear management subunit must be maintained at or above levels that existed in 1998."). It has had "future effect" because the Service and other agencies have implemented the Plan. In turn, the U.S. Forest Service has incorporated the Plan's restrictions on motorized access and its other habitat protections into its forest plans for areas within the grizzly bear's range. 82 Fed. Reg. at 30,516 ("Affected National Forests and National Parks have incorporated the habitat standards and criteria into their

Forest Plans and National Park management plans and/or Superintendent's
Compendia via appropriate amendment processes so that they are legally applied to
these public lands within the [Greater Yellowstone Ecosystem]."); 82 Fed. Reg. at
30510 ("These habitat-based recovery criteria have been met since their
incorporation into the Recovery Plan.").

In summary, the Service's unreasonable rejection of the Center's Petition on
the principal grounds that recovery plans cannot satisfy the definition of a "rule"
and hence the Center had no "right to petition for revision of a recovery plan,"
AR0008, is arbitrary and capricious and not in accordance with law, in violation of
the APA, 5 U.S.C. § 706(2)(A). Because that justification for denying the Petition
was central to the agency's decision, the Court must therefore grant the Center's
motion for summary judgment on its claim that the Service denied the Petition in
contravention of the APA. Compl. ¶¶ 59-68 (Fourth Claim).

## II.   The Service's Petition Denial Arbitrarily Refused To Evaluate The Potential For Bear Recovery In Unoccupied Suitable Habitat, Despite The Agency's Previous Commitments

Given that the Service's primary rationale for denying the Center's Petition
was based on the legally erroneous premise that the Center had no right to petition
at all, it is unsurprising that the remainder of the abbreviated denial letter does not
reasonably respond to evidence proffered in the Petition for why additional
recovery planning is both necessary and consistent with the Service's own past

19

pronouncements. As explained below, this failure affords an additional reason to set aside the Service's denial as arbitrary and capricious.

Although the grizzly bear once ranged throughout most of western North America, AR0329 (Recovery Plan at 9), the Service's recovery efforts have "centered on and around the remaining populations in portions of Wyoming, Montana, Idaho, and Washington." AR0009 (Denial Letter). In denying the Center's Petition, the Service summarily asserted that "any additional recovery planning is subject to Service prioritization and is discretionary." AR0009. This cursory statement cannot afford a nonarbitrary basis for denial of the petition. While the Service may have some discretion in determining how to administer its program to conserve the grizzly bear, that discretion is not without limitation and, at the very least, the Service must provide a reasonable explanation for exercising its discretion in a particular manner. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,* 139 S. Ct. 361, 371 (2018) (requiring the Service to provide a nonarbitrary explanation for its decision on whether to exclude certain areas from the gopher frog's critical habitat designation and explaining that its decision would violate the APA if the "agency did not appropriately consider all of the relevant factors that the statute sets forth to guide the agency in the exercise of its discretion").

The Service's perfunctory response is especially arbitrary in view of the agency's own past pronouncements on the need for more expansive recovery

planning for the grizzly bear. When the Service prepared the 1993 Recovery Plan, it recognized the importance of pursuing grizzly bear recovery in other areas where the species once lived and thus committed to "evaluate the feasibility of grizzly bear recovery in the San Juan Mountains of Colorado and other potential recovery areas throughout the historical range of the grizzly bear . . . ." AR0433. The Service expected that the analysis would take five years to complete. *Id*.

In 2011, after two decades of inaction, the Service reiterated in its 5-Year Status Review its original commitment to evaluate additional areas for grizzly bear recovery. It explained that "other areas throughout the historic range of the grizzly bear in the lower 48 States should be evaluated to determine their habitat suitability for grizzly bear recovery," including "Colorado, New Mexico, Arizona, Utah, California, Nevada, Oregon, and southern Washington." AR05370.

Because the Service did not thereafter update the Plan to evaluate or pursue recovery in any of these historical grizzly bear habitats, the Center filed its Petition in 2014. The Petition asked the Service to revise its 1993 recovery plan "to include all significant remaining areas of suitable habitat across the grizzly bear's native range in the western U.S." AR0011.

The Petition "compiled information from all available studies of grizzly bear habitat." AR0015. It determined that "roughly 110,000 square miles of additional habitat" remains available to support grizzly bear recovery, representing more than

21

triple the habitat found in the Greater Yellowstone and Northern Continental

Divide Ecosystems combined. *Id*.; *see* AR0021 (mapping these habitats). These

include the Mogollon Rim and Gila Wilderness complex in Arizona and New

Mexico (14,488 square miles), the Sierra Nevada mountains in California (7,747

square miles), the Grand Canyon in Arizona (6,180 square miles), and the Uinta

Mountains in Utah (6,067 square miles). AR0022.

Despite this evidence of abundant suitable habitat for additional grizzly bear

recovery, and the Service's own prior statements concerning the need for recovery

planning in additional areas, the Service summarily denied the Petition. AR0008.

The agency has taken no steps to amend the Plan or pursue grizzly bear recovery

outside of the northern Rocky Mountains and Washington.

As an initial matter, it appears that the Service reflexively denied the

Center's Petition without first considering its substance. In a June 19, 2014 email

chain between Service recovery program staff – who had just learned of the

Center's Petition through media coverage – the then-Grizzly Bear Recovery

Coordinator dismissed the import of the Center's Petition by stating that it "is just

an effort to get these people newspaper coverage." SUPPAR010931. He explained

his intent to deny the Petition even though the agency had "not yet received [it]

officially." *Id*. Rejecting the Petition out of hand is the essence of arbitrary and

capricious decisionmaking. *See, e.g.*, *Nehemiah Corp. of Am. v. Jackson*, 546 F.

Supp. 2d 830, 847-48 (E.D. Cal. 2008) (finding that an agency official "prejudged the merits of the rule by manifesting an unalterably closed mind"); *Bonnichsen v. United States*, 217 F. Supp. 2d 1116, 1133 (D. Or. 2002) (explaining that the court set aside the original agency decision after determining that the Corps had prejudged the outcome). *Cf. Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002) (evidence suggestive of prejudgment "diminishes the deference" owed an agency's decisions).

In its letter denying the Petition, the Service did not explain its departure from its longstanding commitments in the 1993 Recovery Plan and the 5-Year Review to evaluate other areas of historical habitat for grizzly bear recovery. That failure is fatal under the APA. As the Ninth Circuit has explained, "[w]hen an agency reverses a prior policy or statutory interpretation" the agency must "show not only that its new policy is reasonable, but also [] provide a reasonable rationale supporting its departure from prior practice." *Seldovia Native Ass'n v. Lujan*, 904 F.2d 1335, 1345 (9th Cir. 1990).

Furthermore, in a September 17, 2014 email chain in which agency staff edited the press release explaining the reasons for the Service's denial of the Petition, the Service stated that additional recovery areas requested in the Petition are "no longer capable of supporting" grizzly bears. SUPPAR010913; SUPPAR010916. This rationale has *no* scientific support in the record, which

shows an abundance of unoccupied habitat capable of supporting viable grizzly bear populations. AR0022; AR0872. Thus, the Service has also provided an "explanation for its decision . . . that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Instead of explaining its departure from its previous commitments to evaluate additional areas – that the record shows remain suitable for bear recovery – the Service simply asserted that it has "satisfied [its] statutory responsibilities for recovery planning and implementation for the grizzly bear . . . ." AR0009. However, as discussed below in Section IV, evaluation and pursuit of grizzly bear recovery in additional areas is necessary to comply with the Service's conservation obligations imposed by section 4(f) and section 7(a)(1) of the ESA. In failing to acknowledge that bear recovery in additional areas is necessary to fulfill the ESA's conservation mandates, the Service has "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) ("Whether an agency has overlooked 'an important aspect of the problem' . . . turns on what a relevant substantive statute makes 'important.'"). For this additional reason, the Service's disregard for more bear recovery – and its denial of the Petition on that basis – is arbitrary and capricious.

In summary, the Service previously recognized the need to evaluate the recovery potential of additional areas, such as in Arizona, California, Colorado, and Utah. The Service cannot now simply declare "never mind." At a minimum, the Service must explain its departure from its previous commitments. Such arbitrary and capricious decisionmaking by the Service provides another reason why the Court must grant the Center's motion for summary judgment on its claim that the Service unreasonably denied its Petition.

## III.   The Service's Additional "Reasons" For Denying The Petition Are Arbitrary And Capricious

Other than asserting that additional recovery planning would be discretionary (addressed above in Section II), the Service offers just two additional "reasons" for its denial. First, the Service asserts that it has prioritized areas of suitable habitat where the grizzly bear lived in 1975, and second, that additional recovery efforts would "erode" recovery success in occupied areas because of "limited grizzly bear recovery dollars." AR0009. As explained below, neither assertion can withstand even minimal scrutiny, let alone the "thorough, probing, in-depth review" required under the APA. *Citizens to Pres. Overton Park*, 401 U.S. at 415.

### A.     Even Under The Service's Priorities Stated In Its Denial Letter,

25

**Recovery Is Necessary In The San Juan Mountains**

The Service's denial of the Center's Petition states that the agency "prioritized . . . the locations where grizzly bear populations were present or thought to be present in 1975 (when they were listed) and where habitat and environmental conditions existed for grizzly recovery." AR0009. Yet the mere fact that the Service initially "prioritized" grizzly bear recovery in locations where grizzly bears were present or thought to be present in 1975 does not afford a rational basis for refusing to evaluate other potential recovery areas *45 years* after the initial listing, especially given, as discussed above, its commitments to do so in the 1993 Recovery Plan and the 5-Year Status Review.

Moreover, to be consistent with its stated prioritization of suitable habitat where the grizzly bear lived in 1975, the Plan must address potential for bear recovery in Colorado's San Juan Mountains ("San Juans"), where grizzly bears lived at the time of listing and could return. Yet the agency's cursory denial of the Petition does not even mention the San Juans.

The Plan explains that grizzly bears lived in the San Juans at the time of listing in 1975. AR0331 (explaining that a poacher shot a grizzly bear in the San Juan National Forest in Colorado in 1979). It recognizes the San Juans as one of the areas that "either have or recently had the potential to provide adequate space and habitat to maintain the grizzly bear as a viable and self-sustaining species."

26

AR0353. Moreover, this area still contains abundant grizzly bear habitat. In a 2019 draft study, Service scientists concluded that abundant "secure core" habitat remains for the grizzly bear in its historical range in the San Juans (5,747 square miles). AR0875. In addition, science summarized in the Center's Petition shows that 4,004 square miles of habitat remains in the Southern Rockies, which include the San Juans. AR0022.

The Service refused to update the Plan to evaluate or pursue bear recovery in the San Juans even though that area falls within the Service's own stated priorities, as expressed in the Petition denial itself. As such, the Service's internally inconsistent decision "runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2009) (explaining that a reviewing court "need not defer to the agency when the agency's decision is without substantial basis in fact."). Such unreasonable decisionmaking violates the APA.

### B.   Pursuit of Recovery In Additional Areas Would Not "Erode" Recovery Success

The Service also asserts in its denial of the Petition that "[a]ny additional recovery planning would require redirecting limited grizzly bear recovery dollars away from these ongoing recovery efforts with subsequent erosion of recovery success." AR0009. That blind assertion is not accompanied by further explanation, has no record support, is contrary to law, and must be rejected.

27

Because the Service has been saying for decades that evaluation of additional areas for bear recovery is necessary, *see supra* Section II, it cannot now just blithely assert – without further explanation or evidence in its denial letter or the record – that recovery planning for other areas would now somehow erode "recovery success" in the northern Rocky Mountains.

In fact, a more comprehensive approach to grizzly bear recovery would follow the Service's own recovery planning guidance, which calls for application of the conservation biology principles of representation, resilience, and redundancy. AR0030-31; 82 Fed. Reg. at 30621 (explaining in the Service's grizzly bear delisting rule that recovery requires "substantial representation, resiliency, and redundancy"). Redundancy, for example, would be furthered by reintroducing bears into the Southwest, where they would forage on foods different than in the Northern Rockies, such as Gambell's oak acorns and pinyon pine seeds. AR0031. As the Center's Petition explains, restoring grizzly bears across a wider variety of ecosystems would ensure the evolutionary potential of grizzly bears in a world that is rapidly changing due to climate change, nonnative species, and human population growth. AR0011. In these ways, restoring bears to additional areas would enhance – not erode – ongoing recovery efforts in precisely the manner that the Service itself has endorsed.

Furthermore, the Service is now *curtailing* its recovery efforts in the

28

northern Rockies. The Service has attempted to remove federal protections for the Greater Yellowstone Ecosystem population of grizzly bears, *Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1003 (D. Mont. 2018), and has announced plans to remove protections from the grizzlies in the Northern Continental Divide Ecosystem. 83 Fed. Reg. 18,737, 18,739 (April 30, 2018) (noting that "the population in the Northern Continental Divide Ecosystem may be eligible for delisting in the near future"). With the Service reducing its recovery efforts in the Greater Yellowstone and Northern Continental Divide ecosystems, the Service has more flexibility to now invest its "limited grizzly bear recovery dollars" in recovery planning for other areas.

Instead, the Service wants to myopically focus on existing recovery efforts in occupied areas without analyzing the need for additional recovery efforts in presently unoccupied areas of the grizzly bear's historical range. But time and time again, the courts have criticized the Service for narrowly focusing on occupied recovery areas and ignoring the importance of additional areas across species' historical ranges. *See, e.g.*, *Humane Soc'y of the United States v. Zinke*, 865 F.3d 585, 606 (D.C. Cir. 2017) (gray wolf: "An important factor—the possible enduring consequences of significant loss of historical range—was left out of the analysis all together."); *Tucson Herpetological Soc'y v. Salazar*, 566 F.3d 870, 877 (9th Cir. 2009) (flat-tailed horned lizard: "It is insufficient, under *Defenders*, to point to one

29

area or class of areas where lizard populations persist to support a finding that

threats to the species elsewhere are not significant; the ESA requires a more

thorough explanation.") (citing *Defs. of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir.

2001)).

Indeed, the D.C. Circuit addressed an analogous issue when the Service

removed protections from wolves in the Great Lakes region but did not consider

the impact on wolf recovery across the wolf's historical range. It explained that

"when a species is already listed, the Service cannot review a single segment with

blinders on, ignoring the continuing status of the species' remnant." *Humane*

*Soc'y*, 865 F.3d at 601. This Court followed that well-reasoned case when rejecting

the Service's attempt to remove grizzly bear protections from the Greater

Yellowstone Ecosystem without analyzing impacts to grizzly bear recovery

elsewhere. *Crow Indian Tribe*, 343 F. Supp. 3d at 1014. This Court explained that

"the Service must consider how the delisting affects other members of the listed

entity, the lower-48 grizzly bear . . . ." *Id*.

Although these court decisions concern delistings, they are relevant to the

recovery planning at issue here. Just as in those cases, the Service, in denying the

Petition, has refused to analyze the grizzly bear's vast unoccupied historical range

or consider those areas' importance to overall grizzly bear recovery.

In summary, the agency's assertion that recovery in additional areas would hurt efforts in existing areas cannot afford a rational basis for denial of the Petition, especially given the Service's previous commitments to evaluate additional areas, evidence in the record of the importance of additional areas, and case law holding that the Service cannot approach species recovery "with blinders on, ignoring the continuing status of the species' remnant." *Humane Soc'y*, 865 F.3d at 601. This provides yet another reason why the Service's denial of the Petition violates the APA.

## IV.    By Failing To Evaluate Or Pursue Bear Recovery In Additional Areas, The Service Is Violating Its Conservation Duties Under The ESA

As explained, the Service has plainly abused its discretion in responding to the Center's Petition. However, beyond the agency's unlawful denial of the Petition, the Service's failure to revise the grizzly bear's Plan to address bear recovery in additional areas – when the agency itself has long acknowledged the need to do so – violates the Service's conservation duties under the ESA.

Under section 4(f) of the ESA, the Service "shall develop and implement" recovery plans for the "conservation and survival" of listed species. 16 U.S.C. § 1533(f)(1). Likewise, under section 7(a)(1), all federal agencies "shall" "utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species . . . ." *Id.* § 1536(a)(1); *see also id.* § 1531(c) ("[A]ll Federal departments and agencies

31

shall seek to conserve endangered species and threatened species and shall utilize

their authorities in furtherance of the purposes of this chapter.").

The ESA's provisions use mandatory language – "shall" – and thus create

nondiscretionary duties upon the Service to use recovery planning and other

programs for "conservation" of the grizzly bear. 16 U.S.C. §§ 1533(f)(1),

1536(a)(1); *see Carson-Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257,

261 (9th Cir. 1984), *cert. denied*, 105 S. Ct. 1842 (1985) ("This circuit considers

this language to be mandatory."). Indeed, numerous circuits, including the Ninth

Circuit, have recognized that the ESA imposes on the Service and other agencies a

judicially reviewable, affirmative duty to conserve.[5]

The ESA broadly defines "conservation" to mean "the use of all methods

and procedures which are necessary to bring any endangered species or threatened

species to the point at which the measures provided pursuant to this Act are no

longer necessary." 16 U.S.C. § 1532(3). Thus, consistent with the conservation

---

[5] *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1417
(9th Cir. 1990) (finding that "agencies have affirmative obligations to conserve
under section 7(a)(1)"); *Sierra Club v. Glickman*, 156 F.3d 606, 616 (5th Cir.
1998) ("Given the plain language of the statute and its legislative history, we
conclude that Congress intended to impose an affirmative duty on each federal
agency to conserve each of the species."); *Fla. Key Deer v. Paulison*, 522 F.3d
1133, 1146 (11th Cir. 2008) ("[S]ection 7(a)(1) imposes a judicially reviewable
obligation upon all agencies to carry out programs for the conservation of
endangered and threatened species.").

mandate in sections 4(f) and 7(a)(1), the Service must "develop and implement" a recovery plan that can bring grizzly bears "to the point" where the ESA's protections are "no longer necessary." *Id.* A recovery plan that ignores vast unoccupied areas cannot get the grizzly bear "to the point" at which the Act's measures "are no longer necessary." *Id.*; 50 C.F.R. § 402.02 ("Recovery means improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act."); *see Fla. Key Deer v. Brown*, 364 F. Supp. 2d 1345, 1360 (S.D. Fla. 2005) ("[T]o fulfill the requirements of ESA § 7(a)(1) a federal agency must develop a program aimed at improving the viability of a species so that it eventually may be de-listed."); *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 133 (D.D.C. 2001) ("Congress has spoken in clarion terms: the objective, measurable criteria [of section 4(f)] must be directed towards the goal of removing the endangered or threatened species from the list.") (quoting *Fund for Animals*, 903 F. Supp. at 111). That further recovery is needed for the grizzly bear to be considered truly "conserved" is evidenced by the fact that the Service itself has repeatedly acknowledged the need to evaluate additional areas for grizzly bear recovery. Additionally, "roughly 110,000 square miles of additional habitat" – more than triple the habitat found in the Greater Yellowstone and Northern Continental Divide Ecosystems combined – remains available to support grizzly bear recovery. AR0015; *see supra* Section II.

Furthermore, the ESA imposes upon the Service a "specific and particular" rather than "generalized duty" to conserve species. *Sierra Club*, 156 F.3d at 615; *Fla. Key Deer v. Brown*, 364 F. Supp. 2d at 1360-61 (rejecting the agency's reliance on a nationwide conservation program when no actions under that program were taken in one county where endangered species live). This means that the Service cannot rely on conservation measures only in occupied areas to satisfy its "specific and particular" duty to conserve the bears in the vast unoccupied areas of their historical range.

Yet the Service has refused to take *any* steps towards recovering the grizzly bear in vast unoccupied areas with suitable habitat for grizzly bear recovery, such as in Arizona, California, Colorado, and Utah. AR0022. Because the Service has no conservation program for important grizzly bear recovery areas, its inaction violates the ESA's conservation mandate.

Moreover, pursuit of grizzly bear recovery in additional areas would reflect the "institutionalized caution" necessary to promote the ESA's purpose of conservation. *Crow Indian Tribe*, 343 F. Supp. 3d at 1015. Indeed, the Supreme Court stated that "the plain intent of Congress in enacting [the ESA] was to halt *and reverse* the trend toward species extinction, whatever the cost." *Tenn. Valley Auth.*, 437 U.S. at 184 (emphasis added); *see also id.* at 174 (stating that the Court's "examination of the language, history, and structure of [the Act] indicates

beyond doubt that Congress intended endangered species to be afforded the highest of priorities.").

While the Service may have choices to make in how to satisfy its overarching obligation to conserve the grizzly bear, no reasonable basis exists for the Service to fail  – in contravention of its own past commitments  – to take *any* actions across the vast majority of the bear's historical range. The Service's unreasonable refusal to evaluate or pursue grizzly bear recovery outside of the occupied areas violates the conservation mandate of sections 7(a)(1) and 4(f), as well as the APA. 16 U.S.C. § 1536(a)(1); *id*. § 1533(f); 5 U.S.C. § 706(2)(A).

The Center is therefore entitled to summary judgment as to its Second and Third Claims for Relief. *See* Compl. ¶¶ 42-58. The Court should remand to the Service to evaluate other potential recovery areas throughout the historical range of the grizzly bear and determine what additional measures are required to satisfy its obligations under sections 4(f) and 7(a)(1). *Ctr. for Biological Diversity v. Vilsack*, No. 2:13-cv-1785-RFB-GWF, 2018 U.S. Dist. LEXIS 110261, at *3-4 (D. Nev. June 19, 2018) (remanding to the agency to consider its options to cure its violation of section 7(a)(1)).

## V.    The Service's Refusal To Update The 1993 Recovery Plan With Current Scientific Information Is Contrary To The APA And ESA

In addition to failing to engage in recovery planning for unoccupied historical habitat never previously addressed by the Service, the Service is acting

arbitrarily, capriciously, and contrary to the ESA by failing to update what the 1993 Recovery Plan does address.

In the 5-Year Status Review, the Service explains that, except for the supplements covering specifically identified recovery areas, "the recovery plan and the associated recovery criteria have not been updated since the plan was released in 1993" and "no longer reflect[] the best available and most up-to-date information on the biology of the species and its habitat." AR05277-78. In the section entitled "Recommendations for Future Actions," the Service's first listed recommendation is to "[r]evise the recovery plan . . . so that it reflects the best scientific and commercial information available." AR05368.

These statements are buttressed by numerous other documents in the administrative record showing that grizzly bear experts from the Service and partner agencies identified aspects of the 1993 Recovery Plan that need updating. *See, e.g.*, AR05070 ("Cabinet/Yaak and Selkirk Chapters - Revise demographic standards and protocols to monitor demographic standards."); SUPPAR008628 ("Goal #1: Update the grizzly bear recovery plan . . . for listed ecosystems"); AR02164 ("[R]evise the recovery plan for grizzly bears in the [North Cascades Ecosystem] so that it reflects the best scientific and commercial information available.").

36

Because the Service did not act to correct the deficiencies with the Plan, the Center filed its 2014 Petition, which "call[ed] for an updated recovery plan," including "revised recovery criteria" for areas addressed in the Plan. AR0030. Under the APA's reasoned decisionmaking standard, the agency must "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Yet the Service's denial letter includes *no* mention of the Petition's request for Plan updates. AR0008-09.

As such, the Service did not consider information and analysis – from its own scientists in the 5-Year Review and elsewhere in the record – that demonstrate the need to replace the Plan's outdated information with current science. The Service "failed to address a problem that the agency itself identified, without offering an explanation as to why it was not practicable for the agency to do so." *Ctr. for Biological Diversity v. Zinke*, 399 F. Supp. 3d 940, 949-50 (D. Ariz. 2019) (Mexican wolf recovery plan).

"Of course, agencies may change their policies over time. But an agency must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1190 (9th Cir. 2019). The Service showed no such awareness here. Because the Service failed to supply any explanation for its refusal to update the Plan, despite

37

previously acknowledging that the Plan needs updating, the Court should conclude

that its denial of the Petition was arbitrary and capricious.[6]

Moreover, because the record shows that required elements of the Plan are

outdated, the Service must update the Plan to be consistent with the

nondiscretionary duties imposed by section 4(f) of the ESA. Pursuant to that

section, the Service must include in recovery plans (1) "site-specific management

actions" necessary for the conservation and survival of the species, and (2)

"objective, measurable criteria" by which to monitor the species' recovery. 16

U.S.C. § 1533(f)(1)(B). Thus, an important factor for the Service to consider when

deciding whether to update the recovery plan is whether the plan still satisfies the

ESA's requirements. *Or. Natural Res. Council*, 92 F.3d at 798 ("[W]hether an

agency has overlooked 'an important aspect of the problem' . . . turns on what a

relevant substantive statute makes 'important.'").

Consider section 4(f)'s requirement that a recovery plan include "objective,

measurable criteria which, when met, would result in a determination, in

accordance with the provisions of this section, that the species be removed from

---

[6] Subsequent to its denial of the Center's Petition, the Service in 2017 (AR0100) and 2018 (AR0047) issued two Plan supplements, thus, anomalously, partially doing what the Petition requested despite having denied it. The Service never updated the Cabinet-Yaak, Selkirk, or other recovery chapters, however, and they remain unchanged since their drafting more than two decades ago.

the list." 16 U.S.C. § 1533(f)(1)(B)(ii). The Service uses the Plan's criteria –

including population goals – to monitor the status of recovering bear populations

and determine when they have recovered. AR0398 (1993 Recovery Plan). But for

the Cabinet-Yaak and Selkirk ecosystems, for example, these criteria have

remained unchanged since 1993, even though grizzly bear experts have been

unanimous in their conclusion that the criteria must be updated. SUPPAR010935

(agreeing to update these chapters "using new criteria based on updated

methodology"); AR04842 (concluding that "demographic criteria in both chapters

should be updated with the best currently available science"); SUPPAR008254-83

(explaining the need for updates for recovery targets and criteria to demonstrate

viability for Cabinet-Yaak and Selkirk recovery chapters); AR05070

("Cabinet/Yaak and Selkirk Chapters - Revise demographic standards and

protocols to monitor demographic standards.").

　　　　Furthermore, consider section 4(f)'s requirement that recovery plans include

a "description of such site-specific management actions as may be necessary to

achieve the plan's goal for the conservation and survival of the species." 16 U.S.C.

§ 1533(f)(1)(B)(i). When new science shows that different management actions are

"necessary to achieve the plan's goal for the conservation" of the grizzly bear, the

Service must update the Plan to provide for the conservation of the species, as

required by the ESA. *Id*. Here, grizzly bear experts identified changes needed in

39

the measures prescribed by the outdated Plan, such as how to best implement the

directive to translocate bears into the Cabinet Mountains to supplement the

population and increase genetic diversity. SUPPAR08265; *see also* SUPPAR10967

(explaining that the Plan's section on "Management of Genetic Diversity" must be

"update[d] w/ info. from Miller and Waits 2003"). But the Service has failed to

make these necessary changes to the Plan.[7]

Because the record leaves no doubt that required elements of the Plan are

outdated and, hence, that the Plan in its current form therefore cannot perform its

vital functions under the ESA, the Service must update the Plan to be consistent

with the nondiscretionary duties imposed by section 4(f). Indeed, when the Service

fails to comply with nondiscretionary duties in its recovery planning, as here,

courts appropriately hold that the Service violates section 4(f). *E.g.*, *Fund for

Animals*, 903 F. Supp. at 113 (holding that the Service violated section 4(f)

because the Service "has failed to meet its obligation under the ESA to incorporate

---

[7] Moreover, the ESA requires use of best available science when making listing
and delisting decisions, 16 U.S.C. § 1533(b)(1)(A), (b)(2), and a recovery plan's
ultimate goal is "that the species be removed from the list." 16 U.S.C.
§ 1533(f)(1)(B)(ii). Use of best available science in delisting decisions therefore
requires use of best available science in setting recovery criteria, as those criteria
are used to inform when the species should be removed from the list. *Id.*; *see Fund
for Animals*, 903 F. Supp. at 114 (reviewing the Service's population goals in the
grizzly bear recovery plan for whether they complied with the best available
science requirement). The Service found that the 1993 Recovery Plan "no longer
reflects the best available science," AR05277-78, but failed to make the needed
corrections.

into the [Grizzly Bear Recovery Plan] objective, measurable criteria addressing genetic isolation.").[8]

In summary, the record shows that the Service and its own grizzly bear experts identified numerous aspects of the 1993 Recovery Plan that need to be updated. These outdated aspects include the "objective, measurable criteria" and "site-specific management actions" that section 4(f) of the ESA requires. The Service has not only failed to abide by these statutory obligations, but it denied the Center's Petition without any explanation as to why it would refuse to update the Plan with current science, as its grizzly bear experts have urged. For these reasons as well, the Service's failure to update the Plan and its denial of the Center's Petition violates section 4(f) of the ESA, 16 U.S.C. § 1533(f), and the APA, 5 U.S.C. § 706(2)(A).

---

[8] *See also Grand Canyon Tr. v. Norton*, No. 04-CV-636-PHX-FJM, 2006 U.S. Dist. LEXIS 2375, at *14 (D. Ariz. Jan. 18, 2006) ("Defendants failed to comply with their non-discretionary duty to provide time and cost estimates pursuant to 16 U.S.C. § 1533(f)(1)(B)(iii)."); *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d at 135 ("The Court will grant partial summary judgment for plaintiffs on their Section 4(f) claim, as defendants have failed to incorporate into the Plan objective measurable criteria for the delisting of the pronghorn, and estimates of the time required to carry out those measures needed to achieve the plan's goal and intermediate steps toward that goal."). *Cf. Ctr. for Biological Diversity v. Zinke*, 399 F. Supp. 3d at 949-50 (holding that the court had jurisdiction to review plaintiff's claim that the Mexican wolf recovery plan violates section 4(f) by failing to include site-specific management actions to address the threat of illegal killings); *Friends of the Wild Swan*, 260 F. Supp. 3d at 1342 ("A citizen may still bring suit under § 1540(g) when the Secretary fails to incorporate, to the maximum extent possible, one of the requirements from § 1533(f)(1)(B) in a given recovery plan.").

The Court must therefore grant the Center's motion for summary judgment as to its Second and Fourth Claims for Relief. *See* Compl. ¶¶ 42-50, 59-68. The Court should remand to the Service for an update of the Plan or for an explanation of why an update is not practicable. *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d at 135 (remanding to Service after granting summary judgment to plaintiffs on section 4(f) claim).

## CONCLUSION

For the foregoing reasons, the Center respectfully requests that the Court grant its motion for summary judgment.

Respectfully submitted this May 19th, 2020.

/s/ Collette L. Adkins
Collette L. Adkins, *admitted pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

/s/ Andrea Santarsiere
Andrea Santarsiere, *admitted pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 469
Victor, ID 83455
(303) 854-7748
asantarsiere@biologicaldiversity.org

/s/ Kristine M. Akland
Kristine M. Akland
AKLAND LAW FIRM PLLC
P.O. Box 7274

Missoula, MT 59807
(406) 544-9863
aklandlawfirm@gmail.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2), I hereby certify that that this brief contains

9,968 words, excluding material Local Rule 7.1(d)(2)(E) omits from the word-

count requirement.

/s/ Collette L. Adkins
Collette L. Adkins, *admitted pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on May 19th, 2020, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system. I further certify that a true and

accurate copy of the foregoing document will be served on all counsel or parties of

record via transmission of Notice of Electronic Filing generated by CM/ECF.

<u>/s/ Collette L. Adkins</u>
Collette L. Adkins, *admitted pro hac vice*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

*Attorney for Plaintiff*