IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>     Plaintiff,<br><br> vs.<br><br>DAVID BERNHARDT, Secretary of the U.S. Department of the Interior; and MARGARET EVERSON, Principal Deputy Director of U.S. Fish and Wildlife Service,<br><br>     Defendants,<br><br>STATE OF WYOMING, STATE OF IDAHO, WYOMING STOCK GROWERS' ASSOCIATION, WYOMING FARM BUREAU FEDERATION, UTAH FARM BUREAU FEDERATION,<br><br>    Defendant-Intervenors. | CV 19–109–M–DLC<br><br><br>ORDER |

Before the Court is Plaintiff Center for Biological Diversity's Motion for

Summary Judgment (Doc. 54); Defendant-Intervenor State of Wyoming's Cross-

Motion for Summary Judgment (Doc. 59); Defendant-Intervenor State of Idaho's

Cross-Motion for Summary Judgment (Doc. 62); Defendant David Bernhardt and

Margaret Everson's Cross-Motion for Summary Judgment (Doc. 65); and

–1–

Defendant-Intervenor Wyoming Stock Growers' Association, Wyoming Farm

Bureau Federation, and Utah Farm Bureau Federation's (together "Agricultural

Associations") Cross-Motion for Summary Judgment (Doc. 69).  For the reasons

explained, the Center's motion is denied.  All remaining motions are granted.

**BACKGROUND**

In 1975, the U.S. Fish and Wildlife Service ("the Service") listed the grizzly

bear as a threatened species in the lower 48 states.  40 Fed. Reg. 31,734 (July 28,

1975).  Although the grizzly bear once ranged throughout most of the west, with a

population estimated to be over 50,000, western settlement and eradication

programs proved largely fatal to the bear, and by 1930 grizzly bears were

estimated to occupy no more than two percent of its once vast historical range.  AR

5291.  At the time of listing, less than 1,000 grizzly bears remained.  AR 329.

Pursuant to the ESA, the Service issued its first grizzly bear recovery plan in

1982, and then revised this plan in 1993.  AR 310.  The revised 1993 plan

identified four recovery zones (in the Yellowstone, Northern Continental Divide,

Cabinet-Yaak, and Selkirk areas) and three evaluation areas (in the Bitterroot,

North Cascades, and San Juan Mountains).  AR 315.  Over the coming years, the

Service prepared three geographically specific supplements that cumulatively

resulted in the designation of six recovery zones (in addition to the original four, it

added the North Cascades and the Bitterroot).  AR 716.  The recovery plan's goal

is to achieve recovery by establishing a stable population of grizzly bears in each recovery zone.  AR 312, 335.

In 2011, the Service issued its five-year status review and observed that "other areas throughout the historic [sic] range of the grizzly bear in the lower 48 States should be evaluated to determine their habitat suitability for grizzly bear recovery," including areas in "Colorado, New Mexico, Arizona, Utah, Colorado, Nevada, Oregon and southern Washington."  AR 5370.  Additionally, the Service noted that aside from the geographically updated supplements, "the recovery plan and associated recovery criteria have not been updated since the plan was released in 1993" and "no longer reflect[] the best available and most up-to-date information on the biology of the species and its habitat."  AR 5277–78.  The Service indicated its intent to tackle this work in the future.  *Id.*

In June of 2014, Plaintiff Center for Biological Diversity ("the Center") submitted a letter requesting that the Service update its recovery plan for the grizzly bear to address "significant remaining areas of suitable habitat" across the grizzly bear's historical range, including the Gila/Mogollon complex in Arizona and New Mexico, the Grand Canyon in Arizona, the Sierra Nevada in California, the Uinta Mountains in Utah among others.  AR 16.  The letter also requested the Service address the current scientific information related to bear recovery, such as new research on road density and new techniques to reconnect recovery areas.  AR

33.  As authority for its requests, the Center claimed its letter was a rulemaking petition as permitted under the Administrative Procedure Act.  AR 11.

On September 22, 2014, the Service sent a response letter denying the Center's request and asserting that its letter was not a valid rulemaking petition because "recovery plans are not rules under the APA."  AR 8.  It also indicated that it had "prioritized" recovery where bear populations were thought to be present at the time of listing.  AR 9.  The Service indicated that "any additional recovery planning is subject to Service prioritization and is discretionary."  *Id.*

Between 2017 and 2018, the Service subsequently updated its recovery criteria for the Yellowstone Ecosystem and the Northern Continental Divide Ecosystem but did not tackle the remaining four recovery zones.   AR 47, 100.

Subsequently, in 2019, the Service evaluated whether the San Juan Mountains or other areas within the grizzly bear's historical range are appropriate for reintroduction.  AR 872–89.

 On June 27, 2019, the Center filed suit claiming, inter alia, that the Service's 2014 denial of its petition was arbitrary and capricious.  (Doc. 1.)

LEGAL STANDARDS

I.    Endangered Species Act

Congress enacted the Endangered Species Act ("ESA") to conserve and protect threatened and endangered species.  16 U.S.C § 1531(b).  "Congress

intended endangered species to be afforded the highest of priorities," and its "plain intent . . . in enacting [the] statute was to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Authority v. Hill*, 437 U.S. 153, 174 (1978). To that end, the ESA requires the Secretary of the Interior to identify endangered and threatened species and define their critical habitat. 16 U.S.C. §§ 1533, 1536.

Once a species is listed, § 4(f) of the ESA instructs the Secretary to "develop and implement" a recovery plan "for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species[.]" 16 U.S.C. § 1533(f). While each agency retains broad discretion in designing the particulars of its recovery plan, each plan must contain the following three components:

> (i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;
> (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and
> (iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

16 U.S.C. § 1533(f)(1)(B).

The ESA's citizen suit provision provides the primary mechanism for enforcing the ESA. *See* 16 U.S.C. § 1540(g)(1)(C); *Bennett v. Spear*, 520 U.S.

154, 165 (1997).  This provision authorizes "any person [with standing to] commence a civil suit . . . against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary."  *Id.*

## II.    Summary Judgment

When a district court reviews an agency decision, summary judgment is the "appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."  *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985)).  Generally summary judgment is appropriate when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In an APA case, however, the summary judgment standard is modified by the APA.  A court may not overturn an agency's decision unless it is arbitrary and capricious.  *City & Cty. of San Francisco*, 130 F.3d at 877.

Under this standard:

[A]n agency must examine the relevant data and articulate a satisfactory explanation for its action.  An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law.

–6–

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 746 F.3d 970, 974 (9th Cir. 2014)

(internal citation and quotation marks omitted).

DISCUSSION

## I.     Mootness

The Center's 2014 letter, submitted as a rulemaking petition, made two

requests of the Service.  *See* AR 16.  It requested the Service update its recovery

plan to evaluate the potential for grizzly bear reintroduction in additional suitable

habitat within its historical range.  *Id.*  It also requested it update the plan to reflect

the best available and most current science on the subject.  *Id.*  Although the

Service denied those requests in its response letter citing limited resources as a

constraint, the Service then apparently completed some, if not all, of the work the

Center had requested.  (Doc. 66-1 at 5.)  The Service updated the recovery plan

twice in that time with supplements addressing recovery criteria.  AR 47, 100.  It

also evaluated whether the San Juan Mountains or Sierra Nevada Mountains were

appropriate for reintroduction.  (Doc. 66-1 at 5.)

When the Service filed its cross-motion for summary judgment, it included

an affidavit prepared by Dr. Jennifer Fortin-Noreus, a wildlife biologist and

member of the Interagency Grizzly Bear Study Team for the Greater Yellowstone

Ecosystem.  (*Id.* at 1.)  Dr. Fortin-Noreus explains the work she and her team

conducted in 2019 in preparation for issuing a new draft proposed rule.  (*Id.* at 6.)

Their team evaluated the potential for habitat throughout the grizzly bear's historical range, focusing their efforts on the San Juan Mountains and the Sierra Nevada Mountain Range, as these areas proved most promising. (*Id.* at 5, 7.) Dr. Fortin-Noreus concluded that reintroduction was not likely to be successful, however, as these two areas contained less secure core habitat than the current six recovery zones and both were unlikely to achieve a self-sustaining population. (*Id.* at 8–11.)

This affidavit, coupled with the 2017 and 2018 updates to the recovery criteria, raise a mootness concern. The United States Constitution constricts the subject matter of Article III courts to justiciable "cases" and "controversies." U.S. Const., Art. III, § 2. A moot case does not present a case or controversy. *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1172 (9th Cir. 2009). A case becomes moot when "changes in the circumstances . . . forestall[] any occasion for meaningful relief." *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (en banc). The question here is whether any of the Service's work between 2017 and 2019 moots the Center's requested relief. Stated differently, the question is whether "it is impossible for [the Court] to grant any effectual relief" to the Center, when the Service appears to have analyzed additional areas throughout the grizzly bear's historical range and updated its recovery criteria. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).

As an initial matter, the Center asserts that the Court may not review the Fortin-Noreus affidavit because it does not fall within one of the Ninth Circuit's recognized exceptions to the rule against admitting extra-record evidence in an APA case. *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). As the Service notes, the Court is not limited to the record rule in determining whether it has jurisdiction over a case. (Doc. 76 at 9 n.1); *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1528 (9th Cir. 1997).

When asked at oral argument whether the Fortin-Noreus affidavit rendered its lawsuit moot, the Center asserted that the only way to moot an improper denial of a petition is to have a new decision that supersedes that denial. This is inaccurate. The question of mootness hinges on whether there is any remaining available relief; it is not tethered to a single mechanism. When asked the same question, neither the Service nor the Defendant-Intervenors took the bait to argue that the Court lacks subject matter jurisdiction over this entire dispute.

Nevertheless, the Court has an independent duty to examine the basis for its jurisdiction even in the absence of the parties' arguments. *Aguirre v. S.S. Sohio Intrepid*, 801 F.2d 1185, 1189 (9th Cir. 1986). In fact, the Court must presume it is without jurisdiction unless and until it concludes otherwise. *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989).

Although the Fortin-Noreus affidavit directly answers the Center's call to evaluate the potential for additional recovery areas, the Center also requested the Service update its recovery criteria as listed in the 1993 Recovery Plan with the best available science.  AR 16.  This request is consistent with the Service's recognition in its 5-year status review that such criteria had become outdated.  AR 5368, 5277–78.  Elsewhere, the Service specifically noted that the Cabinet/Yaak and Selkirk Chapters required a revision to their standards and protocols for population monitoring.  Supplemental AR 8628.  The Center concedes that in 2017 and 2018, the Service conducted most of this required work.  (Doc. 55 at 45 n.6.) The Center maintains, however, that the Service never updated the criteria for the Cabinet-Yaak and Selkirk Chapters.  (*Id.*)

The Service retains broad discretion in the development of its recovery plan, and there is no mandate that any recovery plan be based on the best available science.  *Ctr. for Biological Diversity v. Zinke*, 399 F. Supp. 3d 940, 947–49 (D. Ariz. 2019) ("Although FWS might logically aim to incorporate the best available science where practicable, whether the agency does so or not is a separate inquiry from whether the agency has produced a recovery plan that satisfies Section 4(f)" because "Section 4(f) . . . does not include a 'best available science' mandate."). Given the Service's vast and unreviewable authority in this area, it is not clear that the Service's 2017 and 2018 updates necessarily fail to satisfy the Center's broad

request for inclusion of more up-to-date science, even without providing an update to each Chapter.  Nevertheless, as the Center did not update all of its recovery criteria, there remains a small window of relief available to the Court.

The same is true of Center's request to evaluate additional potential recovery areas.  Although the Service arguably complied with the Center's request when it addressed the potential for recovery in the San Juan and Sierra Nevada Mountains, it did not specifically address the potential for successful reintroduction throughout other areas of the grizzly bear's historical range including the Gila/Mogollon complex in Arizona and New Mexico, the Grand Canyon in Arizona, and the Uinta Mountains in Utah.  AR 16.

In sum, although it appears the Service has largely satisfied the substantive requests of the Center's petition, there remains work that could be done, and the Court will not deny the Center's case on mootness.

## II.    Standing

The Service asserts that the Center lacks standing because it cannot prove that it has suffered an injury "fairly traceable" to the Service's conduct and it cannot show redressability.  (Doc. 66 at 17–18.)  To establish Article III standing,

> the plaintiff has the burden of establishing . . . : (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision.

*Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)).  It does not appear the Service challenges the first requirement to standing.

As for the latter two, the Court sees no issue.  The Service argues that the Center's members' injury—that they have been denied the ability to observe grizzly bears throughout their historical range—cannot be traced to the Service because the Service did not remove the bears from those areas.  (*Id.* at 17.)  Be that as it may, it is no stretch of the imagination to say that the current plan's failure to designate additional areas once occupied by grizzly bears as recovery zones has prolonged and exacerbated their injury.

As for redressability, the Service asserts that even if the Court instructed it to evaluate additional areas, any additional evaluation would not necessarily lead to the reintroduction of grizzly bears in those areas, so the Center is unable to show that a "favorable decision is substantially likely to redress its . . . injury."  (Doc. 66 at 18.)  But here, the Center complains of a procedural injury so the standard for assessing redressability is lowered.  *Id.* at 1226.  A plaintiff need only show "that they have a procedural right that, if exercised, *could* protect their concrete interests."  *Id.* (citing *Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946, 957 (9th Cir. 2005) (emphasis in original).  The Center has met this burden by alleging that, had the Service not summarily denied its petition, it *could* lead to the

reintroduction of grizzly bears throughout suitable areas of its historical range. The Center has standing to pursue its claims.

## III.    The Center's Claims

After receiving a summary denial of its request for the Service to update the recovery plan, the Center seeks this Court's review.  The problem is that recovery plans themselves are largely unreviewable.  *Friends of the Wild Swan, Inc. v. Dir. of United States Fish & Wildlife Serv.*, 745 F. App'x 718, 720 (9th Cir. 2018) (unpublished).  The Ninth Circuit has determined that 5 U.S.C. § 704 precludes judicial review of recovery plans as they are not actions "made reviewable by statute" nor are they "final agency actions."  *Id.*  With these doors closed, the Center cleverly asserts that even though recovery plans *themselves* are not final agency actions, the Service's denial of its petition (as authorized under 5 U.S.C. § 553(e)—a petition in response to agency rulemaking) *is* a final agency action which allows for judicial review.  (Doc. 55 at 17–19.)  Secondarily, the Center asserts that its challenge to the Service's failure to update its 1993 Recovery Plan is reviewable under the ESA's citizen suit provision.  (*Id.* at 38–39.)  Both arguments ultimately fail.  Notwithstanding the merits of the Center's claim that the Service is simply not doing enough to protect the grizzly bear, Congress has authorized only limited avenues for judicial review of administrative action, none of which are available in this case.  The Court will first address why the APA does

not authorize the Center's backdoor challenge to the 1993 Recovery Plan.  It will then address why the Center cannot invoke the ESA's citizen suit provision for the claims raised in this litigation.

### A. The APA does not authorize a challenge to a recovery plan as a rulemaking petition because recovery plans are not rules.

As an initial matter, Defendants do not directly dispute the Center's claim that the Service's denial of its petition is a "final agency action."  Instead, it argues that the APA does not authorize a rulemaking petition to a recovery plan because recovery plans are not "rules" within the APA's definition at 5 U.S.C. § 551(4).  Alternatively, Idaho and the Service both argue that the Court may simply skip this question and deny the Center's claim on the merits, finding that the Service's denial of the petition was not arbitrary and capricious.  (Docs. 63 at 19; 66 at 46.)  This alternative proposal begs the question: if review of the petition is not authorized under § 553(e) and § 704, under what authority is the Court able to reach the merits?  When asked at oral argument, the Service asserted that the Court could review the Center's petition under 5 U.S.C. § 706—which, in pertinent part, restricts a court from setting aside agency action unless it finds such action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law[.]"  5 U.S.C. § 706(2)(A).  However, § 706 merely determines the "scope of

review"—it is not an independent authorization for review.[1]

The APA authorizes judicial review to persons "suffering legal wrong

because of agency action, or adversely affected or aggrieved by agency action

within the meaning of a relevant statute[.]"  5 U.S.C. § 702.  Despite this broadly

encompassing language, not all agency action is reviewable.  *Lujan v. Nat'l*

*Wildlife Fed'n*, 497 U.S. 871, 882 (1990).  The APA constricts a federal court's

subject matter jurisdiction to only those agency actions that are specifically

authorized for judicial review by statute—such as the ESA's citizen suit

provision—or are "final agency actions."  5 U.S.C. § 704; *Lujan*, 497 U.S. at 882;

*Ukiah Valley Med. Ctr. v. FTC*, 911 F.2d 261, 264 n.1 (9th Cir. 1990) ("finality is .

. . a jurisdictional requirement").  An agency action is final when it: "(1) 'mark[s]

the consummation of the agency's decisionmaking process' and (2) "[is] one by

which rights or obligations have been determined, or from which legal

---

[1] The Court supposes it *could* construe the Service's urging a merits decision as a concession that despite the Center's tenuous authority for bringing a petition, the Service's denial itself constitutes a "final agency action."  The Court will not adopt this interpretation, however.  If the Center can obtain judicial review over the Service's denial of its petition regardless of whether a recovery plan is a rule, it renders a large portion of the Service's briefing on the subject simply irrelevant.  The Court will not adopt an interpretation of a parties' argument that renders moot the central question of this litigation.  For this reason, the Court generously assumes that the Service opposes any contention that its denial constitutes a "final agency action" *if* a recovery plan is not a rule.

consequences will flow.'"  *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Contrary to Idaho and the Service's suggestion, the questions here are sequenced: the first question is whether a recovery plan constitutes a rule under § 551(4)—the answer to which determines whether the petition itself is valid.  If there is no valid petition, the Center's so-called "petition" is simply a solicitation letter for which the Service had no legal obligation to respond (and correspondingly, its denial letter creates no rights or obligations and there is no final agency action).  Only if the petition is valid does the Service's denial constitute a final agency action which, in turn, vests this Court with subject matter jurisdiction over the merits.  Only then may the Court reach the second issue of whether the Service's denial was arbitrary and capricious.  Because the Court answers the first question in the negative, it lacks jurisdiction to reach the second.

Turning to the first issue, the APA grants each "interested person the right to petition for the issuance, amendment, or repeal of a rule."  5 U.S.C. § 553(e).  A rule, in turn, is defined as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy[.]"  5 U.S.C. § 551(4).  The Center asserts that as a matter of statutory interpretation, a recovery plan fits squarely within the APA's broad

definition as a statement of "general or particular applicability and future effect

designed to implement or prescribe law or policy[.]"  (Doc. 55 at 17–24.)

In response, Wyoming and the Agricultural Associations assert that recovery

plans are not rules because they are not binding upon the agency.  (Docs. 59 at 20–

21; 70 at 17–18.)  Idaho observes that the agency has vast discretion in developing

its recovery plan and carrying out its recovery efforts, and recovery plans do not

create rights or obligations in third parties.  (Doc. 63 at 9–11.)  While these

observations are all true, the argument that a recovery plan is not a rule because it

is nonbinding misses the mark for failing to address the statutory issue.  The

nonbinding nature of a recovery plan, while certainly not irrelevant, is not a

sufficient explanation for why a recovery plan is not a rule because it does not

address which component of the APA's definition fails.  Although the belief that

rules are mandatory likely accords with the word's ordinary meaning,[2] that is not

the meaning which governs here.  *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000)

("When a statute includes an explicit definition, we must follow that definition,

even if it varies from that term's ordinary meaning.").

---

[2] For example, Black's Law Dictionary defines a rule as "an established and authoritative
standard or principle; a general norm mandating or guiding conduct or action in a given type of
situation."  Rule, Black's Law Dictionary (11th ed. 2019).

The Service tackles the statutory question directly.  It asserts that a recovery plan is not a rule because it fails the component of the APA's definition which requires a rule to "implement or prescribe law or policy."  (Doc. 66 at 37–39.)

The first question then is whether a recovery plan implements law.  The Center argues that a recovery plan implements law because it enacts the ESA's mandate to incorporate particular standards into each recovery plan.  (Doc. 55 at 19–20.)  It is true that pursuant to § 4(f), each recovery plan must contain three components:

> (i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;
> (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and
> (iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

16 U.S.C. § 1533(f)(1)(B).  However, the Center's argument—in sum, that a recovery plan is a rule because it implements the statutory requirements for a recovery plan—is circular and therefore unpersuasive.

The next question is whether a recovery plan implements policy.  The Center argues that the relevant policy is Congress's conservation policy as enacted by the ESA.  (Doc. 55 at 20.)  While there can be no doubt that recovery plans promote or further conservation, the Service hinges its argument on the word "implement,"

arguing that a recovery plan does not, on its own, "implement" anything. It asserts that recovery plans are guidance documents "with no tangible effect on the species . . . *unless and until* implemented through subsequent agency actions." (Doc. 66 at 37–38 (emphasis in original).)

Because the APA does not define "implement," the Court will rely on the word's ordinary meaning. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning."). The Center posits the following definition: to implement means "to give practical effect to and ensure actual fulfillment by concrete measures." (Doc. 72 at 14 (citing Implement, https://www.merriam-webster.com/dictionary/ implement).) This definition accords with the Oxford English Dictionary's—to "put (a decision, plan, agreement, etc.) into effect." Implement, Oxford English Dictionary, https://www.lexico.com/en/definition/implement.

Here, the Service has the better argument. A recovery plan does not implement conservation policy because it does not, in and of itself, create change; it doesn't "put [itself] into effect." This is not to diminish its importance as a vital tool of conservation. It's simply a recognition that recovery planning is only a precursor to policy implementation. The "implementation" occurs when the agency takes concrete action that complies with the plan's guidance.

The Center raises no specific argument as to why it believes a recovery plan "prescribes law or policy," nevertheless, the Service's analysis of the issue leaves little doubt that it does not. As the APA provides no specific definition, the Service cites the following: to "prescribe" means "to dictate, ordain, or direct; to establish authoritatively (as a rule or guideline)." (Doc. 66 at 38 (citing Black's Law Dictionary (11th ed. 2019).) On this point, Defendant-Intervenors' arguments carry the day. A recovery plan cannot "prescribe" law or policy because it does not "authoritatively" establish or dictate the agency's action. Nor does it always "direct" an agency's action—although it may.

What's important here is that recovery plans do not bind an agency into any single course of action. *Ctr. for Biological Diversity*, 399 F. Supp. 3d at 947. By design, recovery plans are flexible documents that allow an agency to deviate from the plan as circumstances change. *See Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1114 n.8 (9th Cir. 2015) ("The Endangered Species Act does not mandate compliance with recovery plans for endangered species."); *Friends of Blackwater v. Salazar*, 691 F.3d 428, 434 (D.C. Cir. 2012) ("A plan is a statement of intention, not a contract. If the plan is overtaken by events, then there is no need to change the plan; it may simply be irrelevant."); *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 107–08 (D.D.C. 1995) *as amended by* 967 F. Supp. 6 (D.D.C. 1997) (recognizing that the Service is entitled to "flexibility as it

implements [a] recovery plan," because "[b]y the time an exhaustively detailed recovery plan is completed and ready for publication, science or circumstances could have changed and the plan might no longer be suitable"). A recovery plan is merely a "road map," or a statement of intent, that may be followed at times and disregarded at others. *Fund for Animals*, 903 F. Supp. at 103. For this reason, the Court concludes that although vital, the nonbinding and discretionary nature of recovery plans means they do not "prescribe" law or policy and therefore do not fit within the APA's definition of a rule.

This conclusion is bolstered by the fact that the ESA specifically allows persons to petition "to add a species to, or to remove a species from" threatened or endangered status. 16 U.S.C. § 1533(b)(3)(A). Congress's specific inclusion of the right to petition for listed status, and failure to include any specific petition right when it comes to recovery plans in the same statute is unlikely to be arbitrary. *Wadler v. Bio-Rad Labs., Inc.*, 916 F.3d 1176, 1186 (9th Cir. 2019) ("We [] presume that Congress acts intentionally when it uses particular wording in one part of a statute but omits it in another."). This result is also consistent with the Ninth Circuit's determination that recovery plans are not reviewable under statute or as final agency action. *Friends of the Wild Swan, Inc.*, 745 F. App'x at 720. To permit a plaintiff to circumvent this rule by simply bringing a rulemaking petition

-21-

prior to its lawsuit creates a backdoor challenge to the substance of every recovery plan and renders the APA's limited review virtually meaningless.

Having so concluded, the Court need not address the Service's remaining argument that § 553(e) does not authorize petitions for "general statement[s] of policy." (Doc. 66 at 39.) The Court lacks subject matter jurisdiction to review the merits.

### B. The Center cannot invoke the ESA's citizen suit provision for the agency's purported failure to update its recovery plan with a broader geographic analysis or updated science.

The Center next claims that the Service violated its duties under § 4(f) and § 7(a)(1) of the ESA by failing to update its 1993 Recovery Plan to address additional potential recovery areas across the grizzly bear's historical range and by failing to update its plan as the science on grizzly survival has changed. (Doc. 55 at 38.) As the basis for the Court's jurisdiction, the Center invokes the ESA's citizen suit provision, which allows an individual to bring suit "against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). The Center asserts that § 4(f) imposes a nondiscretionary duty on the Service to "develop and implement" recovery plans for the "conservation and survival" of listed species, and that § 7(a)(1) imposes a

nondiscretionary duty to "carry out programs for the conservation of endangered species." (*Id.*)

In response, the Service argues that the Court lacks jurisdiction over the Center's § 4(f) claim, and the § 7(a)(1) claim fails as a matter of law and fact. (Doc. 66 at 20–36.) The Court will start with the jurisdictional question which is dispositive.

The Service argues that § 4(f) imposes no mandatory duty to "revise a recovery plan, implement specific portions of a plan, or provide recovery throughout a species' historical range." (Doc. 66 at 19.) The Court agrees.

As an initial matter, the Court notes that even the decision to develop a recovery plan in the first place is one that is left to the discretion of the Secretary. Under § 4(f), a recovery plan is not required when the Secretary "finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1). If the Secretary elects to develop a recovery plan, the plain language of the statute requires the Secretary to include three specific plan components,[3] but only "to the maximum extent practicable[.]" *Id.* While the phrase "'to the maximum extent

---

[3] These are: (1) "a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;" (2) "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list;" and (3) "estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal." 16 U.S.C. § 1533(f)(1)(B).

practicable' does not permit an agency unbridled discretion," *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 131 (D.D.C. 2001), it does significantly constrain a court's review, *Ctr. for Biological Diversity*, 399 F. Supp. 3d at 948.  A court may review a recovery plan to the extent it is missing one of the required plan components (absent a showing that its inclusion was "impracticable"), *e.g.*, *Grand Canyon Tr. v. Norton*, No. 04-CV-636PHXFJM, 2006 WL 167560, at *5 (D. Ariz. Jan. 18, 2006), but it may not entertain disagreements with the agency concerning the substance of those components, *Ctr. for Biological Diversity*, 399 F. Supp. 3d at 949.

Recognizing that any challenge to the substance of a recovery plan must be tethered to one of the three components listed at § 1533(f)(1)(B), the Center argues that § 4(f) creates a nondiscretionary duty for the Service to update its recovery plan to include a broader geographic recovery analysis as a "description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species."  (Doc. 55 at 46–47.)  The Court disagrees.  The Center does not argue that the 1993 Recovery Plan failed to include a "description of . . . site-specific management action."  Its argument here amounts to nothing more than a policy disagreement about the best way to promote grizzly bear conservation.  To the extent the Center believes that the 2011 5-year status review—which noted the need to update the recovery plan with newer science and

expand the scope of its recovery analysis—created nondiscretionary duties, the law clearly refutes this contention.  The only nondiscretionary duties which are cognizable under § 4(f) arise from a failure to include a necessary requirement under 16 U.S.C. § 1533(f)(g)(1)(B)—they do not arise from subsequent policy statements issued by the agency.  Nor does the Service's awareness that updated analysis would be beneficial void any part of the 1993 Recovery Plan.  Because the Center has alleged no failure to act pursuant to a nondiscretionary duty, the Court lacks jurisdiction to hear this claim.

The Center next argues that the Court may review its claim concerning the best available science because it goes to the Service's duty to use "objective and measurable criteria[.]"  (Doc. 55 at 45.)  The Court disagrees.  Section § 4(f), "unlike its statutory counterparts, does not include a 'best available science' mandate," *Ctr. for Biological Diversity*, 399 F. Supp. 3d at 949.  At most, this claim amounts to a mere disagreement over the ongoing validity of the objective and measurable criteria as listed in the 1993 Recovery Plan.  Accordingly, the Court lacks jurisdiction over the Center's § 4(f) challenges.

The Center's § 7(a)(1) claim fairs no better.  The Center argues that § 7(a)(1) imposes a mandatory conservation duty on the Service.  Speaking to interagency cooperation, § 7(a)(1) requires "[a]ll other Federal agencies,"—by which the statute means all "non-Interior Department agencies," *Pyramid Lake Paiute Tribe*

*of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1417 n.15 (9th Cir. 1990)—to

consult with the Secretary and "utilize their authorities . . . by carrying out

programs for the conservation of endangered species and threatened species listed

pursuant to section 1533 of this title."  16 U.S.C. § 1536(a)(1).  Although the Court

does not disagree that § 7(a)(1) imposes a mandatory conservation duty, that duty

plainly does not apply to the Fish and Wildlife Service which is an Interior

Department agency.  The Center clarified at oral argument that their broad

conservation challenge was specifically tailored to § 7(a)(1) and they had not

alleged any other source for this duty.  Accordingly, the Center does not allege any

duty—let alone a nondiscretionary one—which would allow it to bring a § 7(a)(1)

claim against the Service under the ESA's citizen suit provision.

Having concluded that the Court lacks jurisdiction to hear any claims raised,

IT IS ORDERED that the Center's Motion for Summary Judgment (Doc.

54) is DENIED.

IT IS FURTHER ORDERED that Defendant-Intervenor State of Wyoming's

Cross-Motion for Summary Judgment (Doc. 58) is GRANTED.

IT IS FURTHER ORDERED that Defendant-Intervenor State of Idaho's

Cross-Motion for Summary Judgment (Doc. 62) is GRANTED.

IT IS FURTHER ORDERED that the Service's Cross-Motion for Summary

Judgment (Doc. 65) is GRANTED.

IT IS FURTHER ORDERED that Defendant-Intervenor Agricultural

Association's Cross-Motion for Summary Judgment (Doc. 69) is GRANTED.

DATED this 23rd day of December, 2020.

Dana L. Christensen, District Judge
United States District Court